# Ex. 2

```
***************************************************
                                                   *
 In the Matter of the Arbitration                  *
                                                   *
       between                                     *
                                                   *
 PHOENIX BULK CARRIERS (BVI) LTD.,                 *         Final Award
             as Disponent Owner                    *
                                                   *
             and                                   *
                                                   *
 TRIORIENT LLC,                                    *
             as Charterer                          *
             of the MV PRETTY LADY                 *
                                                   *
 Under Charter Party dated 11 November, 2016       *
                                                   *
***************************************************
```

Before:  Molly McCafferty, Chair
         David W. Martowski
         John F. Ring, Jr.

Appearances:

      For Phoenix Bulk Carriers (BVI) LTD:
      Freehill Hogan and Mahar, LLP
      By:   Peter J. Gutowski
             Barbara G. Carnevale

      For Triorient LLC.:
      Lennon, Murphy & Phillips LLC
      By:   Patrick F. Lennon
             Keith W. Heard

**September 27, 2019**

## BACKGROUND

Phoenix Bulk Carriers (BVI) Ltd. (hereinafter "Phoenix" or "Owner") initiated this arbitration to recover $391,221.55 in detention and lost profits arising from a series of events involving a voyage charter with Triorient LLC (hereinafter "Triorient" or "Charterer") dated 11 November 2016 for the M/V PRETTY LADY. Triorient chartered the vessel from Phoenix to transport a full cargo of 34,000MT 10% MOLOO of DRI A (Intention called in B/L direct reduced iron (A) briquettes, hot moulded) from 1 SB Palua, Venezuela or 1SB/SA Puerto Ordaz, Venezuela to Diliskelesi, Turkey[1].

## THE CHARTER PARTY

A formal Charter Party Agreement was never provided to the Panel and the Panel presumes it was never drawn up. To memorialize the agreement, the parties refer to charter party recap dated November 11, 2016 that included numerous terms agreed between the parties and incorporated by reference a prior fixture:

> OTHERWISE AS PER LAST MV BULK BEOTHUK/TRIORIENT-HBI
> (DRA A) VENEZUELA-VERACRUZ, MEXICO-CP DATED OCT 10, 2016-
> LOGICALLY AMENDED AS PER MAIN TERMS AND CONDITIONS...

Specifically, Clause 32 of the proforma cp provided *interalia:*

> 32. US Law/New York arbitration to apply
>
> Any and all differences and disputes of whatsoever nature arising out of this charter shall be put to arbitration in the City of New York before a panel of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. The arbitration shall be conducted pursuant to the Rules of the Society of Maritime Arbitrators of New York currently in effect. The applicable law shall be the general maritime law of the United States. ........Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the

---

[1] Owners Exhibit 1, Charter party recap.

premises[2].

Clause 62 of the pro-forma charter provides:

> 62.    Any time lost by force majeure, war, insurrection, civil, commotion, political disturbances, riots, epidemics, strikes or lockouts, floods, frost, stoppage on railway, canal, quay, wharf, jetty, rope or cable way, loading or discharging plants or equipment, lack of trucks or railroad cars, stoppage of workmen or other hands connected with the handling of the cargo, whether partial or general, or time when by any cause of whatsoever kind or nature-beyond the control of the Charterer or its agents, the supplying, loading, discharging, or conveyance of the cargo from the mines to the vessel is prevented or delayed, shall count as halftime even when vessel is on demurrage. Running time from customary anchorages to loading and discharging berth shall not count as laytime even if vessel is on demurrage.

Attached as a Rider Clause to the Pro Forma Charterparty is the force majeure clause. Triorient relies on paragraph A of the Clause which provides:

> A.    Neither the vessel, the Master, Carrier nor Charterer shall, unless otherwise in this contract expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from economies of mine, government intervention, technical problems, Act of God, act of war, insurrection, riot, embargo, perils of the sea, fire, explosions, earthquake, storm, tidal wave or similar disturbance, flood, drought, act of public enemies, pirates or assailing thieves, arrest or restraints or princes, rulers or people or seizure under legal process provided bond is promptly furnished to release the vessel or cargo; breakdown of machinery or facilities on board any vessel; breakdown of shore machinery or facility including shore loading and discharging equipment for more than ten (10) days; transportation or handling difficulties; strike, lockout, combination of workmen, stoppage or restraint of labor from whatever cause, either partial or general; law, act, order, proclamation, decree, regulation, ordinance, instruction or request of government or other public authorities, federal, state, local or foreign; judgment or decree of a court of competent jurisdiction; delay or failure of usual carriers or contractors, or suppliers of cargo, at any time or business curtailment, labor shortage or inability to obtain raw materials including cargo, operating materials, plant equipment or materials required for maintenance or repairs; any contingency or delay or failure or cause of any nature beyond the reasonable control of Charterer or of Carrier, whether or not of the kind herein above specified (any such contingency, delay or failure being hereafter called "force majeure"), preventing or hindering Charterer from shipping or Carrier from transporting the cargo referred to herein. Prompt written notice to the other party shall be given by the party affected by such force majeure. Any party invoking force majeure pursuant to this Clause, shall upon termination of such Force

---

[2] Charterers' Exhibit 2, Beothuk/Triorient CP dated October 10, 2016.

3

Majeure, give prompt notice thereof to the other party[3].

## CLAIMS

Phoenix claims $391,221.55 plus interest for detention and lost profits arising from the alleged unilateral and wrongful cancellation of the subject charter. It also seeks an award of costs and fees of $87,769.22 together with an assessment of the panel's fees against Triorient.

Triorient denies Phoenix' claims in their entirety and requests that attorneys' fees and disbursements in the amount of $41,091.4, together with the panel's fees be assessed against Owner. In support of its position, Triorient argues several theories why it is not responsible for any damages to Phoenix. First, Charterers suggest the force majeure clause applies therefore absolving them of any liability. Charterers further argue that they had no obligation to load cargo on board the PRETTY LADY because the vessel was unseaworthy. Particularly Triorient argues the vessel was not capable of transporting the contracted DRI A cargo for which they chartered the vessel. Alternatively, if the Panel finds Phoenix is entitled to recover damages for the cancellation, Triorient suggests Owners failed to properly mitigate the claim and any damages should be limited to $126,180.12.

## PROCEEDINGS

Having not received payment of its invoices for detention and lost profits, Phoenix appointed David Martowski as arbitrator on November 21, 2017. Triorient appointed Jack Ring as arbitrator on December 11, 2017. Together Mr. Ring and Mr. Martowski appointed Molly McCafferty as Chair.

Phoenix submitted its Preliminary Statement of Claim on May 18, 2018 together with supporting exhibits.

Triorient filed its Preliminary Opposition Submission together with supporting documents/Exhibits on December 17, 2018.

A hearing was held on February 5, 2019 where Mr. Robert Seward, Vice President of Phoenix Bulk Carriers and Mr. Facundo Santucci, Senior Vice President of Triorient provided direct testimony. The parties submitted Final Post-Hearing Memoranda on May 31, 2019 and

---

[3] Id at page 24.

4

Reply Briefs on June 28, 2019. Triorient was permitted a Sur-Reply Brief that was served on August 2, 2019. The pleadings were closed on August 9, 2019, after both parties submitted Affidavits/Declarations in support of fees and costs.

## FACTS

The basic underlying facts are not in dispute. Triorient is a buyer and seller of commodities and finished products with extensive experience in purchasing from suppliers in Venezuela[4]. They participated in a tender to purchase direct reduced iron, hot moulded briquettes, type A (DRI A) from Complejo Siderurgico de Guayana, C.A. (Comsigua), a state-owned producer of raw materials. In this case Triorient was awarded the tender on November 9, 2016, and Comsigua provided the contract to Triorient on Thursday, November 10, 2016[5]. Having been awarded the tender, Triorient sold the cargo to a buyer in Turkey and then entered into a charter party with Phoenix on November 11, 2016 to transport a full and complete cargo of 34,000MT 10% MOLOO of DRI A from 1 SB Palua, Venezuela or 1SB/SA Puerto Ordaz, Venezuela to Diliskelesi, Turkey[6]. When the fixture was concluded, the vessel commenced her voyage across the Atlantic from West Africa where she arrived at Palua, Venezuela on November 26, 2016[7]. It is not in dispute that Comsigua cancelled the tender with Triorient on November 13, 2016, though this fact was not disclosed to Phoenix until much later, after the vessel arrived at the mouth of the Orinoco River. Once Comsigua cancelled the tender, Triorient unsuccessfully tried to source the cargo from an alternative producer, Iconserca. Without another cargo to provide to the M/V PRETTY LADY, Triorient cancelled the charter with Phoenix on December 3, 2016. The events and actions of the parties that took place between the vessel's fixture to Triorient on November 10, and the ultimate cancellation on December 3, 2016 of the charter party comprise the heart of the dispute in arbitration. Phoenix sought to mitigate its damages and after looking into the market, used an in-house fixture with IMI to carry coal by substituting the M/V PRETTY LADY for the M/V BULK TRIDENT.[8] Phoenix then presented its claim for detention and lost profits to Triorient which was subsequently rejected.

---

[4] Hearing transcript, Direct of Mr. Santucci, p.137-138.
[5] Exhibit 1 of Triorient's Preliminary Opposition Submission.
[6] Owner's Exhibit1
[7] Owner's Exhibit 2, Agent's Statement of Facts
[8] Hearing Transcript, Direct of Robert Seward, p.34.

5

## CLAIMANT'S CONTENTION

Owner is seeking to recover $391,221.55 together with interest, costs and fees for its alleged detention and lost profits claim. Phoenix contends the vessel arrived at the load port, within the laycan, on November 26, 2016. As the vessel approached the Orinoco River, the Owners were advised there was a potential problem with the cargo and the vessel was asked to wait and not transit up-river pending "further instructions" from Triorient.[9] Approximately a week later, on December 3, 2016, Triorient issued a cancellation notice seeking to absolve itself of all responsibilities to the Owner for its failed performance[10]. Because of the delays and reports that Triorient did not have a cargo, Owners started to look at other options for the vessel to mitigate any damages. Phoenix substituted the vessel into the performance of a charter that had been previously fixed with IMI to carry coal from La Estacada, Venezuela to Brazil[11]. On December 9, Phoenix issued a detention statement in the amount of $144,194.44 for the time the vessel sat before her next employment at the charter party demurrage rate[12]. In addition to the detention claim, Phoenix seeks to recover additional losses resulting from Triorient's cancellation. Owners calculated their lost profits by subtracting the actual net result of the IMI mitigation voyage[13] from the expected voyage results of the original charter with Triorient[14], resulting in an additional damage claim of $247,027.11

## RESPONDENT'S CONTENTION

Triorient contends a force majeure event as defined by Rider Clause Section A of the applicable force majeure clause prevented their performance of the charter party. Charterers allege that Comsigua's refusal to provide the contract after the tender award, compounded by Iconserca's subsequent failure to perform its contractual obligations to Triorient, constituted a "failure of....suppliers of cargo" resulting in Triorient's inability to produce a cargo.

Alternatively, Triorient argues it had no obligation to load cargo on the M/V PRETTY LADY. It alleges that Clause 78 of the Head Time Charter[15] specifically excluded "Reduced Iron

---

[9] Owner's Exhibit 3, Notice from broker Mid-Ship confirming instructing for the vessel to wait.
[10] Owners' Exhibit 4, Notice of cancellation.
[11] Owner's Exhibit 6, Recap for coal charter with IMI.
[12] Owner's Exhibit 7, Time sheet and Detention Invoice.
[13] Owner's Exhibit 9, Results.
[14] Owner's Exhibit 8, Expected Results.
[15] Triorient's Exhibit 11, M/V PRETTY LADY Head CP

6

Ore Pellets/ Briquettes." Furthermore, Triorient asserts the M/V PRETTY LADY was contractually incapable of carrying the cargo and therefore it was not on arrival (as required by Clause 29 of the Phoenix/Triorient CP) ready to load bulk HBI and steel shells.

As to damages, Triorient argues that Phoenix failed to properly mitigate its damages. With the freight market allegedly rising Triorient suggests Owners should have taken advantage of the rising market rather than substitute the vessel into another less lucrative fixture.

Triorient further alleges that Phoenix has grossly overstated its alleged damages.

## DISCUSSION AND DECISION

The Panel has considered all the facts, evidence and arguments presented in this case and unanimously finds the following:

The root cause of Triorient's inability to provide a cargo as required under the applicable charter party was their own blatant attempt to seek better terms with Comsigua. After having been awarded the tender, Triorient received the contract from Comsigua to sign and return. A few days later, Comsigua reminded Triorient to promptly return the executed contract and remit the 50% payment. Instead of executing the contract and returning it to Comsigua for a counter-signature, Triorient intentionally and deliberately returned the contract to Comsigua unexecuted with proposed amendments to better suit Triorient. Triorient had been dealing in Venezuelan commodities and purchasing raw materials in Venezuela for many years. Mr. Santucci, Triorient's Senior Vice President, described the Venezuelan business environment challenging and deteriorating at the time of the negotiations and subsequent cancellation[16]. In his direct testimony, Mr. Santucci confirmed how difficult it is to do business with these (Venezuelan) government entities because they are not willing to negotiate[17]. Accordingly, Triorient should not have been surprised that Comsigua cancelled the tender after its attempts to re-negotiate with a party it admitted would not negotiate, particularly after being reminded to return the executed contract.

Comsigua cancelled the tender on November 13, leaving Triorient with a vessel to load and no cargo for its Turkish client. Rather than advising Owners of the lost cargo and negotiating

---

[16] Hearing Transcript, Direct of Mr. Santucci, p.138-9.
[17] Id at 163.

7

a settlement with Owners, Triorient allowed the vessel to continue its voyage from West Africa while it first desperately tried to persuade Comsigua to reconsider its cancellation. When it became clear Comsigua would not reconsider the cancellation, Triorient looked for an alternative cargo for the vessel to fulfill its obligations with the Turkish client. Triorient hoped to maintain the vessel as Triorient considered it relatively cheap in the rising market and needed to supply a cargo for its Turkish client[18]. Triorient was able to locate an alternative or substitute cargo with Iconserco, another Venezuelan entity. They commenced negotiations with Iconserco and successfully contracted with them on November 30 to supply the required cargo with laydays of 1 to 31 December [19]. However, it soon became clear the dates Iconserco proposed would fall at the end of the laycan, and possibly beyond 31 December[20]. With the vessel nominated and ready to proceed upriver, Triorient was concerned it would have to pay to hold the vessel until the cargo was ready to load, which now looked to be mid-January[21]. Under the terms of the agreement with Iconserco, Triorient would have been responsible for the cost of holding the vessel until the cargo was ready to load. Triorient then made the decision to cancel the charter with Phoenix on December 3. Triorient tries to argue that Iconserco was a middleman and not a cargo producer. They suggest that Iconserco never had the cargo to trade with Triorient and that is the reason the charter was cancelled. However, the contract with Iconserco was a signed contract. The vessel was accepted by Iconserca. Mr. Santucci expressed hope that the Iconserco cargo would solve all the problems associated with the PRETTY LADY. Unfortunately, the Inconserco cargo became a very expensive solution once the dates fell into January and Triorient decided to cancel the Phoenix charter. When provided with a potential alternative cargo source in Iconserca, Triorient made a decision to not proceed when the dates became too expensive an option to maintain the PRETTY LADY. The decision to cancel the charter was made by Triorient alone.

In defense of its potential liability Triorient argues the cancellation of the Comsigua contract was a force majeure event as defined in the pro forma charter. Specifically, Charterers argue Comsigua's refusal to provide the contract after the tender award, together with Inconserca's subsequent failure to provide a timely cargo are "failure(s) of …(the) suppliers of

---

[18] Id at 160, 214.
[19] Phoenix Exhibit 45, Contract dated November 30, 2016.
[20] Transcript, Cross of Santucci, pp 222-223.
[21] Id at 231, Phoenix Exhibit 46.

cargo" as discussed in Rider Clause Section A of the applicable force majeure clause. The Panel does not find the cancellation of the Comsigua tender, nor the inability of Inconserca to produce a cargo in early December to be force m\ajeure events as defined by the charter. Commercial and strategic decisions gone awry do not make for a force majeure situation excusing Triorient from its obligations. While the applicable force majeure clause is very broad and covers an extensive number of potential force majeure events, it does not excuse the parties' performance if their own behavior causes them to not perform. Accordingly, the Panel rejects Triorient's force majeure declaration and will not comment on the timeliness of the force majeure notice.

In its Post-Hearing Memorandum, Triorient raises an unseaworthiness claim for the first time. It asserts the PRETTY LADY could not carry its intended cargo of DRI A under the charter with the vessel's head owner. In support of the argument Triorient provides a copy of the charter between Phoenix and the Head Owner, references the Gard P&I website the IIMI (International Iron Metallics Association) and refers to the testimony of Mr. Seward, the Phoenix Vice President. The Panel finds this argument to be nothing more than a misdirected arrow, with the supports taken out of context. The International Maritime Solid Bulk Cargoes Code (IMSBC Code) is the industry respected and recognized resource for the safe stowage and shipment of bulk cargoes. It identifies three types of Direct Reduced Iron (DRI) cargo; DRI A, DRI B and DRI C. It is well understood in the industry and by this Panel that DRI A and HBI are the same cargo. Triorient's own representative identifies HBI and DRI A as interchangeable[22]. It is irrelevant that DRI B and DRI C were excluded cargoes under the head charter, as the intended cargo was DRI A or HBI which was a permissible cargo. Charterers' claim of unseaworthiness fails.

Turning our attention to the alleged damages we note that Owners are seeking to recover detention and lost profits resulting from the cancellation.

Owners are seeking to recover detention at $14,500 per day from November 26 when the NOR was tendered through December 6 when she entered her next fixture. The detention rate sought by Phoenix is the demurrage rate in the applicable charter party between the parties. Notwithstanding the detention rate sought by Owners in these proceedings, the parties agreed to a detention rate of $14,000 per day while the vessel was waiting for instructions at the mouth of

---

[22] Transcript, Direct of Mr. Santucci, p 137.

9

the river and prior to the cancellation.[23] Having known the Comsigua cargo tender had been cancelled as of November 13, but not cancelling the charter until December 3, the Panel finds Triorient blatantly disregarded its commercial obligations for its own potential gain. Accordingly, the Panel finds Triorient responsible for detention charges from the time the vessel arrived at the mouth of the river and tendered NOR (November 26) through the cancellation of the Charter on December 3 at the agreed rate of $14,000 per day. Because the vessel sat idle for three days after being cancelled before she was fixed into a new contract, the Panel also awards damages at the same detention rate from December 3 when the charter was finally cancelled through December 6 when she commenced her mitigating voyage.

As to the mitigation and lost profits of Phoenix, it is easy to have perspective in hindsight and harder to appreciate the initial moment as it happened. Owners had an obligation to mitigate damages resulting from the cancelled charter. Phoenix started looking for alternative business for the PRETTY LADY on December 1 when they were advised by the broker that the problems with the cargo had not been resolved.[24] Owners looked at several options including a bauxite cargo from the Amazon River to the US Gulf, a scrap cargo to Mexico from the US East Coast and a grain cargo from the US Gulf to the Caribbean. Ultimately, Owners settled on substituting the PRETTY LADY into an in-house fixture with IMI to carry coal from La Estacada to Sao Luiz, Brazil. The original underlying contract had a second leg to carry DRI C from the Orinoco River to Amsterdam via Trinidad. As the PRETTY LADY was not fitted to carry DRI C, Owners only substituted the PRETTY LADY into the first leg; the coal cargo to Brazil[25].

Owners are seeking to recover their lost profits by subtracting the actual net result of the mitigation voyage from the expected results of the original voyage with Triorient. Based on the available market at the time, the position of the vessel, the timing, the holidays and the amount of waiting time to date, Phoenix argues the substitution of the PRETTY LADY into the IMI Coal cargo was the best available option to mitigate the mounting damages. Triorient presented very little persuasive evidence in opposition to Owners' supports. Triorient suggests that with the rising freight market, Owners should have done more to mitigate; they should have been able to find a fixture that would have netted a profit. Triorient also contends that Owners should have

---

[23] Phoenix Exhibit 22, Email confirmation from Seward to broker.
[24] Id. Transcript, Direct of Mr. Seward, p.28.
[25] Transcript, Direct of Mr. Seward, pp. 30-37.

considered the Comsigua cargo that had been cancelled with Triorient and then subsequently awarded to Ashley, a competitor of both Owners and Charterers. They allege that Owners' failure to consider the Ashley cargo was unreasonable and therefore the claim should be denied. The Panel disagrees with Charterers. Owners looked at many options and chose the fixture they believed was the best at the time. The uncertainties surrounding the original Comsigua cargo and the subsequent award to Ashley were sufficient reasons to allow Owners to look elsewhere in their mitigation efforts. Moreover, Charterers failed to provide any substantive evidence on terms that Ashley would consider including discharge ports, costs, rates or other considerations.

Charterers challenged Owners' mitigation efforts as unreasonable, yet they failed to provide any evidence of any alternative fixtures, yet alone a profitable fixture. The only evidence submitted in opposition to the Owners' mitigation and lost profits is the witness statement of Jeremy Flores, the broker from Mid-Ship Marine, Inc. who brokered the contract. Mr. Flores was asked to review the time charter equivalent (TCE) calculations for the actual voyage performed by the PRETTY LADY and compare it with the theoretical TCE calculations of the original cancelled charter and the TCE calculation assuming the vessel performed both legs of the IMI charter; the coal cargo to Sao Luis and the DRI C to Antwerp. Mr. Flores' statement is given the due weight it deserves. With subjective parameters, tenuous projections and nothing further, it is difficult for Mr. Flores' statement to outweigh the reasonableness of Owners' mitigation voyage. It is incumbent upon the Panel to consider the time and circumstances surrounding the mitigation process. The vessel had originally been fixed to a contract to carry DRI A from Venezuela to Turkey. The vessel was to re-deliver to the head owner in the Med. upon completion of the voyage. The vessel sailed over two weeks from the African coast to arrive at the mouth of the Orinoco River to further wait instructions. The vessel was then blatantly cancelled, through no fault of Owners, just after Thanksgiving in a traditionally slow Holiday period with a rising freight market. Owners looked to the market for reasonable alternatives. Charterers failed to provide contrary evidence of alternative mitigation fixtures. The decision to substitute the PRETTY LADY into the first leg of the IMI fixture was not unreasonable. Charterers' own intentional commercial decisions caused the cancellation of the Comsigua cargo in the first instance and ultimately the cancellation of the Charter. Triorient alone is responsible for the damages incurred by Phoenix. Accordingly, the Panel unanimously finds Owners' lost profit calculations are reasonable and represent their actual losses.

## AWARD

Phoenix as the prevailing party is awarded an 85% allowance towards its attorneys' fees and the arbitrators' fees. Based on the above decision, Triorient LLC is directed to pay Phoenix Bulk Carriers (BVI) LTD. a total of $523,105.72 calculated as follows:

| | |
|---|---|
| Detention ($14,000pd x 9.9444) | $139,221.60 |
| Interest from January 8, 2017(through 9/27) | $18,045.40 |
| Additional damages/Lost Profits | $247,027.11 |
| Interest from February 6, 2017(through 9/27) | $31,282.77 |
| Attorneys' fees and costs (85%) | $74,603.84 |
| Arbitrators' fees shortfall | $12,925.00 |
| Total due to Phoenix | $523,105.72 |

The arbitrators' fees are set forth in Appendix A, which is an integral part of this Award, and payment is to be made in accordance with its terms.

If this award is not satisfied within 30 days from the date hereof, interest shall retroactively accrue at the prime rate from this date until the amount awarded Phoenix has been fully paid, or this award is reduced to a judgment, whichever first occurs. Judgment may be entered on this award in any Court having jurisdiction in the premises in accordance with Clause 32 of the Charter Party.

_____
David W. Martowski

_____
John F. Ring, Jr.


_____
Molly McCafferty

New York, New York
September 27, 2019

13

```
*****************************************************
                                                    *
 In the Matter of the Arbitration                   *
                                                    *
        Between                                     *
                                                    *
 PHOENIX BULK CARRIERS (BVI) LTD                    *         APPENDIX A
            as Disponent Owner                      *
                                                    *
                and                                 *
                                                    *
 TRIORIENT LLC,                                     *
            as Charterer                            *
            of the MV PRETTY LADY                   *
                                                    *
    Under Charter Party dated 11 November, 2016     *
                                                    *
*****************************************************
```

The Panel establishes its fees and expenses in the total amount of $50,500.00, which are the joint and several obligations of the parties. Triorient is hereby directed to pay 85% and Phoenix is directed to pay 15% of the Panel's fees for services rendered as follows.

|                  | Total Fees | Triorient Pays | Phoenix Pays |
|------------------|-----------|----------------|--------------|
| David Martowski  | $15,400   | $13,090        | $2,310       |
| Jack Ring        | $17,700   | $15,045        | $2,655       |
| Molly McCafferty | $17,400   | $14,790        | $2,610       |

The Parties have each deposited $30,000 into the SMA escrow account specifically established for the payment of the Panel's fees. The foregoing fees and expenses are to be paid from the respective escrow accounts in the first instance and are awarded as assessed in the Panel's Final Award. Any remaining balance is to be returned to the respective parties.

New York, New York,
September 27, 2019